UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CECIL W. FIKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-CV-00168 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**AMENDED OPINION AND ORDER**

Plaintiff Cecil W. Fike appeals to the district court from a final decision of the Commissioner of Social Security denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

**I. PROCEDURAL HISTORY**

Fike applied for DIB in May 2008, alleging that he became disabled a few days earlier, on April 28, 2008. (Tr. 13, 117.) The Commissioner denied his application initially and upon reconsideration, and Fike requested an administrative hearing. (Tr. 59-75.) Administrative Law Judge ("ALJ") Yvonne Stam conducted a hearing on January 8, 2010, at which Fike, who was represented by counsel, and a vocational expert testified. (Tr. 27-56.)

On April 12, 2010, the ALJ rendered an unfavorable decision to Fike, concluding that he

---

[1] All parties have consented to the Magistrate Judge. (Docket # 12); *see* 28 U.S.C. § 636(c).

was not disabled because, despite the limitations caused by his impairments, he could perform a significant number of light work jobs in the economy. (Tr. 13-22.)  The Appeals Council denied Fike's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. § 404.981.

Fike filed a complaint with this Court on May 20, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  Fike alleges three flaws with the ALJ's decision: (1) that the ALJ erred by failing to discuss the opinions of his treating orthopaedic surgeons, Dr. Chaykowski and Dr. Mackel; (2) that the ALJ erred by failing to make a credibility determination; and (3) that the assigned residual functional capacity ("RFC")—indicating that he can "frequently" perform repetitive right-arm work—is not supported by substantial evidence.[2] (Docket # 22.)

## II.  FACTUAL BACKGROUND[3]

### A.  Fike's Background

At the time of the ALJ's decision, Fike was fifty-two years old, had a high school education, and possessed work experience as a laborer in a woodworking company. (Tr. 114, 152, 156.)  In his DIB application, Fike alleged that he was disabled as a result of nerve damage in his hands, a heart condition, diabetes, high blood pressure, and high cholesterol. (Tr. 151.)

At the hearing, Fike testified that he lives with his wife. (Tr. 31.)  In a typical day, he

---

[2] Fike also initially argued that the ALJ erred by failing to find at least a twelve-month closed period of disability between September 2004 and April 2006. (Pl.'s Br. 25-28.)  Fike, however, abandoned this argument in his reply brief (Docket # 27), and wisely so, since the record reflects that he engaged in substantial gainful activity during that time period (Resp. Br. 6-7 (citing Tr. 141)).

[3] In the interest of brevity, this Opinion recounts only the portions of the 439-page administrative record necessary to the decision.

watches television for three to four hours and helps his wife with household tasks such as washing dishes, cooking, and sweeping the floor. (Tr. 37-39.) He also drives a car, although his arms hurt while doing so. (Tr. 39.)

As to his physical capacity, Fike estimated that he could lift fifteen to twenty pounds, but stated that lifting causes him arm pain. (Tr. 35.) He reported that he experiences pain in his legs and feet when walking, sitting, or standing; on a ten-point scale, he rated his foot pain between a "seven" and "nine" on a bad day and "four" and "six" on an average day (Tr. 35); he articulated that medications do not help much to reduce his pain (Tr. 42). He thought that he could walk fifty feet before needing to stop and that he could stand or sit for ten to fifteen minutes at a time. (Tr. 35-36.) He complained that his hands swell up and ache after he performs tasks such as frying meat in a skillet or changing antifreeze in a car, rating his upper extremity pain between a "six" and an "eight" on bad day and a "three" and a "five" on an average day (Tr. 39-40, 46-47); his right hand bothers him more than his left (Tr. 47). He also reported that he becomes short of breath with exertion and that he gets headaches every two to three days. (Tr. 44.)

### B. Medical Evidence Prior to Fike's Allege Onset Date

Fike underwent bilateral carpal tunnel releases in 1984 when he was twenty-seven years old. (Tr. 398.) In 2001, he underwent an angioplasty. (Tr. 17, 398.) He is also a diabetic. (Tr. 397.)

In March 2005, Fike was examined by Dr. Thomas Lazoff due to experiencing burning, tingling, stiffness, and pain in both of his hands and wrist, to a greater extent in the right than the left. (Tr. 316.) He reported that his symptoms became quite severe in October 2004, but lessened when he was off work for many weeks; the symptoms returned, however, when he went back to

work. (Tr. 316.)  Dr. Lazoff thought that his symptoms were similar to the carpal tunnel syndrome he had years earlier; indeed, an EMG revealed carpal tunnel syndrome, moderate on the right and mild on the left. (Tr. 347.)  Dr. Lazoff prescribed medication for nerve pain and referred Fike to a hand surgeon. (Tr. 347.)

On March 10, 2005, Dr. Jerry Mackel saw Fike for the continued burning, tingling, stiffness, weakness, and pain in his hands. (Tr. 316.)  Fike said that he was experiencing a "great deal of weakness" in his hands and that he can hardly move his fingers after performing two to three hours of any repetitive activity such as spray painting or playing his bass. (Tr. 316.)  Because of Fike's history, Dr. Mackel was somewhat hesitant to consider exploring the nerve surgically. (Tr. 315.)  Instead, he administered local injections and prescribed medication, a wrist splint, and range of motion exercises. (Tr. 315.)

Fike returned to Dr. Mackel at the end of the month, reporting that he had experienced some pain relief after the injections but still had severe burning and numbness on the dorsum of his wrist and down his ring and fifth fingers. (Tr. 312.)  He told Dr. Mackel that his symptoms were better when he was off work, but when he works for even a short period of time, the burning, swelling, stiffness, and pain increase. (Tr. 312.)  Fike said that he was thinking of retiring from his current job and going into different work that would be less likely to aggravate his hands. (Tr. 312.)  Dr. Mackel did not believe that surgery was advisable and instead recommended that Fike wear an isotoner glove while driving in an effort to control the swelling, burning, and pain. (Tr. 312.)  He assigned Fike a work restriction of no use of the right arm and referred him back to Dr. Lazoff. (Tr. 312, 314.)

Fike returned to Dr. Lazoff in April 2005, reporting that he had noted no improvement in

4

his symptoms from the treatment prescribed by Dr. Mackel. (Tr. 308.) Dr. Lazoff increased Fike's medication and referred him for further diagnostic testing. (Tr. 308.)

On May 4, 2005, Fike visited Dr. Theodore Chaykowski, a colleague of Dr. Mackel's. (Tr. 397-98.) He diagnosed Fike with right moderate carpal tunnel syndrome and right volar wrist ganglion in the carpel tunnel, which was confirmed by an EMG and MRI. (Tr. 397-98.) Dr. Chaykowski, in contrast to Dr. Mackel, recommended that Fike undergo a right carpal tunnel release and excision of the ganglion; he could not, however, assure Fike that the surgery would relieve his symptoms. (Tr. 397.) He maintained Fike's work restriction of "no work with the right upper extremity." (Tr. 397.)

On June 14, 2005, Fike underwent the right carpal tunnel release and wrist ganglion excision surgery. (Tr. 391.) On July 11, 2005, Fike's wrist was still "stiff and swollen," and he had "some wrist pain." (Tr. 386.) Dr. Chaykowski noted that Fike's rehabilitation would "take longer" because of the presence of a ganglion. (Tr. 386.) He renewed Fike's work restrictions and instructed him to wear a right wrist splint at night. (Tr. 386.) By August 22, 2006, the incision was "well healed"; however, Fike's fingers and wrist were "sore and stiff," and he had intermittent numbness and tingling in his palm and fingers. (Tr. 384.) Nevertheless, Fike was willing to try and return to work, and Dr. Chaykowski released him to return to work with no restrictions. (Tr. 383.)

Three months later, on September 12, 2005, Fike returned to Dr. Chaykowski, reporting that he is "hardly able to use his hand" by the end of a workday. (Tr. 380.) He still had pain and intermittent tingling in his hand and felt that he could not handle the amount of work that his employer was expecting him to perform. (Tr. 380.) Dr. Chaykowski ordered repeat

5

electrodiagnostic studies and renewed Fike's restriction of no work with the right arm. (Tr. 380-81.)

On September 29, 2005, Fike told Dr. Chaykowski that he continued to have pain and swelling in his right hand with burning and shooting pain radiating into his forearm at the same intensity he had before surgery. (Tr. 378.) The electrodiagnostic study showed continued median neuropathy with no substantial change in comparison to his pre-operative study. (Tr. 214.)

Fike returned to Dr. Chaykowski on October 10, 2005, reporting that his symptoms had not improved. (Tr. 374.) Dr. Chaykowski contemplated repeating the carpal tunnel surgery, but thought that there was less than a fifty percent chance that the surgery would be helpful. (Tr. 374.) He further opined:

> [Fike] has done repetitive work with his right upper extremity for 20 some years and this finally caught up to him. Because it is he cannot do the usual things required of him at work and there is a good chance that he may never be able to. Unless a different job description is available he will not be able to return to work in that setting.

(Tr. 374.)

On October 24, 2005, Fike reported the same symptoms to Dr. Chaykowski as he did two weeks earlier. (Tr. 370.) Fike, however, declined to undergo another surgery because of the "relatively small chance of success with the surgery." (Tr. 370.) Dr. Chaykowski suggested assigning Fike a permanent work restriction of "no repetitive use of the right arm," but noted that, fortunately, Fike had been offered a new position involving primarily supervisory responsibilities. (Tr. 370.) Dr. Chaykowski assigned Fike a five percent upper extremity impairment and a three percent whole person impairment, opining that the impairment was "expected to be permanent and nonprogressive." (Tr. 370.)

On April 19, 2006, Fike returned to Dr. Chaykowski, reporting that after any use of his right hand at home or work, it swells, becomes painful, and turns blue. (Tr. 367.) Dr. Chaykowski noted that Fike was having difficulty tolerating his job activities even though he had been assigned a permanent work restriction of no repetitive work with the right arm. (Tr. 367.) Dr. Chaykowski maintained this work restriction and opined that it would be better if Fike sought an alternate type of work; he noted that no further treatment was planned for Fike. (Tr. 367.)

Nevertheless, Fike continued to work for two more years, that is, until early 2008. (Tr. 269.) He then filed an application for disability.

### C. Medical Evidence After Fike's Alleged Onset Date

On July 29, 2008, H.M. Bacchus examined Fike on behalf of the State Agency. (Tr. 269-70.) He found normal gait and station and full range of motion. (Tr. 270.) Muscle strength and tone in the upper extremities was 4/5 and in the lower extremities 5/5; grip strength was 4/5 on the right and 3/5 on the left. (Tr. 270.) Fine finger manipulations were slow and appeared to fatigue with repetition, and Dr. Bacchus noted sensory dullness in Fike's distal fingers. (Tr. 270.) He opined that with continued cardiac stability and control of his hypertension, Fike appeared "to retain the functional capacity to perform light duties with limited fine finger manipulation." (Tr. 270.)

On August 8, 2008, Dr. M. Ruiz, a state agency physician, reviewed Fike's record and opined that he could lift ten pounds frequently and twenty pounds occasionally; stand, walk, or sit for about six hours in an eight-hour workday; perform unlimited reaching, pushing, or pulling; frequently climb ramps or stairs, balance, stoop, kneel, or crouch; and occasionally crawl or climb ladders, rope, or scaffolds. (Tr. 273-80.) He also found that Fike could perform frequent

handling, fingering, and feeling with his right hand, and occasional handling, fingering, and feeling with his left. (Tr. 276.)  Dr. Ruiz's opinion was affirmed by a second state agency physician in November 2008. (Tr. 298.)

Also in August 2008, Fike saw Dr. Emilio Vazquez, reporting that his legs ached badly and that he could barely walk the majority of the time. (Tr. 286-87.)  Dr. Vazquez ordered laboratory testing, which was negative with respect to the anti-nuclear antibody and rheumatoid factor. (Tr. 283-84.)

On September 6, 2008, Dr. Subhash Reddy of The Heart Center Medical Group penned a letter noting Fike's history of coronary artery disease, hyperlipidemia, diabetes, hypertension, and stent placement in his left coronary artery. (Tr. 289.)  He stated that Fike's ongoing chest pain rendered him "unable to perform his routine activities." (Tr. 289.)  Dr. Reddy further opined that, because of Fike's multiple health problems, he "strongly believe[d] that [Fike] should be disabled." (Tr. 289.)

In October 2008, Fike was examined by Dr. Paul Later, a neurologist, for complaints of pain in his arms and legs. (Tr. 296.)  Blood work, including Lyme titer, was normal; an EMG did not indicate any electro-physiologic abnormality, myopathy, or neuropathy. (Tr. 409-24.)  The following month, Dr. Later suggested Fike undergo further evaluation for seronegative arthritis. (Tr. 419.)

In November 2009, Fike was seen at St. Martin's Healthcare for problems with his upper extremities, loss of fine finger function, leg and foot pain, and leg numbness. (Tr. 434-39.)  Examination showed numerous tender areas with a diagnostic impression of polymyalgia or fibromyalgia. (Tr. 434-49.)  The following month, Fike reported feeling numb from the waist

down and severe tingling in his legs and feet after standing or walking for one to two hours. (Tr. 434-39.)  Physical examination did not reveal significant abnormalities; monofilament testing showing decreased sensation in only one area out of six on his left foot and none on the right. (Tr. 434-39.)  Fike was prescribed medication. (Tr. 434-49.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC, that is, what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On April 12, 2010, the ALJ rendered her decision. (Tr. 15-28.) She found at step one of the five-step analysis that Fike had not engaged in substantial gainful activity after his alleged onset date and at step two that he had the following severe impairments: diabetes mellitus, coronary artery disease, and limited motion in his hands and fingers. (Tr. 15.) At step three, the ALJ determined that Fike's impairment or combination of impairments was not severe enough to meet or equal a listing. (Tr. 16.)

> Before proceeding to step four, the ALJ assigned Fike the following RFC:
>
> [T]he claimant has the residual functional capacity to perform a limited range of light work. He can lift and/or carry ten pounds frequently and twenty pounds occasionally; sit or stand/walk for about six hours during an eight hour workday; perform unlimited pushing and pulling maneuvers with his upper and lower extremities; occasionally crawl and climb ladders, rope, and scaffolds; frequently balance, stoop/kneel, crouch and climb ramps and stairs; occasionally handle, finger, and feel with the left hand and frequently handle, finger, and feel with the right dominant hand.

(Tr. 16.) Based on this RFC and the vocational expert's testimony, the ALJ found at step four that Fike was unable to perform his past relevant work. (Tr. 20.) The ALJ found at step five, however, that Fike could perform a significant number of other unskilled light jobs within the economy, including office helper, storage facility rental clerk, and stock checker. (Tr. 21.) Therefore, Fike's claim for DIB was denied. (Tr. 22.)

### C. The ALJ Erred By Failing to Examine Dr. Chaykowski's Opinion

Fike first argues that the ALJ erred by failing to consider the opinions of Dr. Chaykowski and Dr. Mackel, the orthopaedic surgeons who treated him for his right upper extremity problems

from 2004 to 2006—two years prior to his alleged onset date. Most significantly, Dr. Chaykowski assigned Fike a permanent restriction of "no repetitive use of the right arm" in October 2005. Fike is correct, as the ALJ's failure to discuss at least the permanent restriction assigned by Dr. Chaykowski necessitates a remand of the Commissioner's final decision.

The Commissioner states: "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). "[M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as a "treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *accord Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

Each medical opinion, other than a treating physician's opinion that is entitled to controlling weight, must be evaluated pursuant to the following factors in order to determine the proper weight to apply to it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. § 404.1527(c); *see White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005); *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1031-32 (E.D. Wis. 2004); *Windus v. Barnhart*, 345 F. Supp. 2d 928, 939-43 (E.D.

Wis. 2004).

Here, the ALJ failed to mention, much less discuss, the treatment records of Dr. Chaykowski and Dr. Mackel from 2004 to 2006. Of course, generally speaking, an ALJ's failure to discuss a treating physician's opinion necessitates a remand of the Commissioner's final decision. *See Snider v. Astrue*, No. 1:08-cv-53, 2009 WL 1766925, at *2 (N.D. Ind. June 23, 2009) (collecting cases and articulating that "the ALJ contravened longstanding administrative and judicial precedent when he failed to evaluate the opinion of [the claimant's] treating physician"); *Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1006 (N.D. Ill. 2008) ("[T]he Seventh Circuit has consistently held that an ALJ must articulate his reasons for rejecting a treating physician's opinion." (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004))); 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

The Commissioner contends, however, that the ALJ was not required to consider the evidence from Dr. Chaykowski and Dr. Mackel because it was created at least two years *before* Fike's alleged onset date. (Resp. Br. 3.) Citing 20 C.F.R. § 404.1512(d), the Commissioner argues that an ALJ is required to develop and consider the medical record for *only* the twelve months prior to the claimant's alleged onset date. (Resp. Br. 3.)

The Commissioner's assertion that 20 C.F.R. § 404.1512(d) states that an ALJ needs to "consider" the medical record for only the twelve months prior to the claimant's alleged onset date, however, mischaracterizes its text. This regulation addresses an ALJ's responsibility to *develop* the record, 20 C.F.R. § 404.1512(d) ("We will make every reasonable effort to help you

13

get medical reports from your own medical sources when you give us permission to request the reports."); it does not, however, limit what documents *the claimant* can gather and introduce in an attempt to prove that he is disabled.[5] *See Clifford*, 227 F.3d at 868 (stating that the claimant bears the burden of proof on steps one through four of the five-step analysis for disability); 20 C.F.R. § 404.1512 (a) ("In general, you have to prove to us that you are blind and disabled.").

In that respect, 20 C.F.R. § 404.1512(a) instructs a claimant that he "must bring to [the Commissioner's] attention *everything* that shows that [he] is blind or disabled" and to "furnish medical and other evidence that [the Commissioner] can use to reach conclusions about [his] medical impairment(s) and . . . its effect on [his] ability to work on a sustained basis." (Emphasis added.) The regulation then defines "evidence" as "anything you or anyone else submits to us or that we obtain that relates to your claim." 20 C.F.R. § 404.1512(b). Here, Dr. Chaykowski's and Dr. Mackel's treatment records became "evidence" when Fike submitted them to the record in January 2010.

The Seventh Circuit has "repeatedly stated that the ALJ's decision must be based upon consideration of *all* the relevant evidence . . . ." *Herrron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (emphasis added). While the ALJ need not evaluate every piece of testimony and evidence submitted, she must sufficiently articulate her assessment of the evidence to assure this Court that she considered the important evidence and to enable this court to trace the path of her

---

[5] In any event, 20 C.F.R. § 404.1512(d) states that an ALJ must develop the claimant's record for "*at least* the twelve months preceding" the claimant's filing of his DIB application, 20 C.F.R. § 404.1512(d) (emphasis added), not *only* the twelve months preceding the claimant's application date. In fact, the ALJ must develop the record even further if "there is a reason to believe that development of an earlier period is necessary." 20 C.F.R. § 404.1512(d).

reasoning. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (explaining that unless the ALJ sufficiently articulates her reasoning, the reviewing court cannot tell if the ALJ rejected probative evidence or simply ignored it). "If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required." *Carlson*, 999 F.2d at 181.

Here, the *permanent* restriction assigned by Dr. Chaykowski—"no repetitive use of the right arm"—rises to the level of an entire line of evidence that the ALJ ignored. (Tr. 370.)  By its very nature—"permanent"—there is no reasonable basis upon which to infer that the restriction somehow expired prior to Fike's alleged onset date. *Cf. Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The ALJ was entitled to make *reasonable* inferences from the evidence before him . . . ." (emphasis added and citation omitted)).  This restriction completely contradicts the RFC assigned by the ALJ indicating that Fike is able to "frequently handle, finger, and feel with the right dominant hand." (Tr. 16.)  Indeed, if the ALJ was uncertain about the applicability of Dr. Chaykowski's "permanent restriction" to the relevant time period, she could have contacted him to request additional clarification. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (stating that an ALJ must recontact medical sources "when the evidence received is inadequate to determine whether the claimant is disabled"); SSR 96-5p, 1996 WL 374183, at *6.

Moreover, to arrive at Fike's RFC, the ALJ assigned "great weight" to the 2008 opinion of the state agency physicians. (Tr. 20, 280, 298.)  But these physicians *never reviewed* Dr. Chaykowski's or Dr. Mackel's treatment notes because their notes were not placed into the record until January 2010. (Tr. 301, 366); *cf. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("The fact that these physicians reviewed the *entire* record strengthens the weight of their

conclusions." (emphasis added)).

As a final lob in defense of the ALJ's decision, the Commissioner asserts that Dr. Chaykowski's and Dr. Mackel's findings—including the permanent restriction of "no repetitive use of the right arm"—are "irrelevant and useless" because Fike continued to work full time for two more years after the restriction was imposed. (Resp. Br. 3.)  Dr. Chaykowski's October 24, 2005, treatment note, however, quickly disposes of that argument:

> I suggested a permanent work restriction of no repetitive use of the right arm.  He *fortunately has been offered a new position by his employer which involves primarily supervisory function*, and he should be able to do well with this.

(Tr. 370 (emphasis added).)  Thus, apparently the supervisory nature of Fike's job duties from late 2005 to early 2008 allowed him to continue working despite his right upper extremity limitations. (*See* Tr. 42-44 (explaining that to accommodate his pain Fike regularly took an additional, unapproved thirty to forty-five minute break during the workday, attempting to "look busy" while doing so to avoid his supervisors' criticism).)  The three jobs cited by the ALJ, however, require the ability to perform "frequent handling, fingering, and feeling" with the right upper extremity (Tr. 50), and, to reiterate, this type of work directly contradicts the permanent restriction assigned by Dr. Chaykowski.

In short, it is clear that a remand is necessary so that the ALJ can consider the opinions of Dr. Chaykowski and Dr. Mackel, Fike's treating orthopaedic surgeons, and most importantly, Dr. Chaykowski's permanent restriction of "no repetitive use of the right arm."

### D. The ALJ Erred By Failing to Assess the Credibility of Fike's Symptom Testimony

Fike also argues that the ALJ erred by failing to assess the credibility of his symptom testimony.  Credibility determinations are the second step in a two-step process prescribed by the

regulations for evaluating a claimant's request for disability benefits based on pain or other symptoms. *Williams v. Astrue*, No. 1:08-cv-1353, 2010 WL 2673867, at *9-10 (S.D. Ind. June 29, 2010); *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. *Krontz v. Astrue*, No. 1:07-cv-00303, 2008 WL 5062803, at *5 (N.D. Ind. Nov. 24, 2008); *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); 20 C.F.R. § 404.1529; SSR 96-7p.  Second, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at *10 (N.D. Ind. Mar. 25, 2010); 20 C.F.R. § 404.929(c).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.

Although the ALJ explained the credibility determination process early in her decision (Tr. 14), she neglected to actually make a determination about the credibility of Fike's symptom testimony. (*See* Tr. 15-22.)  The Seventh Circuit has stated that "while we must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), we must first be certain that a credibility determination has actually been made." *Schroeter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992) (internal citations omitted) (remanding case where the ALJ failed to make a credibility determination); *see also Spaulding v. Barnhart*, No. 05 C 6311, 2007 WL 1610445, at *6 (N.D. Ill. Mar. 2, 2007) (same); *Schwabe v. Barnhart*, 338 F. Supp. 2d 941, 955-56 (E.D. Wis.

```
```
---


2004) (same); *Khan v. Chater*, No. 96 C 2872, 1997 WL 669764, at *4 (N.D. Ill. Oct. 22, 1997) (same).

To reiterate, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (quoting SSR 96-8p).  The ALJ's decision here fails to articulate a definitive credibility determination, together with specific reasons for the finding that were supported by the evidence of record.  Therefore, this omission by the ALJ provides an additional basis for a remand.[6]

## V.  CONCLUSION

For these reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Fike and against the Commissioner.

SO ORDERED.  Enter for this 11th day of April, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[6] Because a remand is warranted so that the ALJ can reconsider the medical source opinions of record and Fike's credibility, the Court need not specifically address Fike's remaining argument.